IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| GARY LABRANCH,<br>　　　　　Plaintiff,<br><br>　vs.<br><br>JAMES YATES, et al,<br>　　　　　Defendants. | Case No. 1:09-cv-00048-AWI-JLT (PC)<br><br>FINDINGS AND RECOMMENDATIONS GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 37) |
|---|---|

　　　　Plaintiff Gary LaBranch ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff complains that he was denied adequate yard time based upon his race.

　　　　Before the Court is Defendants' motion for summary judgment.[1] (Doc. 37).  In the motion, Defendants contend that they are entitled to judgment because there is no evidence they violated Plaintiff's constitutional rights or, if they did, they are entitled to the protections of qualified immunity.  Plaintiff filed an initial Opposition on July 9, 2012 (Doc. 43)[2] and

---

[1] Though the screening process, the Court determined the third amended complaint stated claims against Defendants Yates, Mattingly, Davis, Shannon and Herrera for alleged violations of the Eighth and Fourteenth Amendments. (Doc. 20 and 21).

[2] On June 4, 2012, Plaintiff requested and was granted a 30-day extension of time to file an Opposition to Plaintiff's motion.

Defendants replied. (Doc. 41).³ Having reviewed the arguments and evidence of both parties, the Court recommends that Defendants' motion be **GRANTED**.

## I.   FACTUAL BACKGROUND

The case involves a series of events that began in May 2008 at Pleasant Valley State Prison ("PSVP") and continued until Plaintiff was transferred to another institution in April 2009. During that time, Plaintiff was housed in Facility "B" (also referred to as B yard). (Doc. 37-5 at 5). During this time, Defendant Shannon was the Captain of Facility B, Herrera was the Appeals Coordinator, Defendants Yates, Mattingly, and Davis, were the Warden and Associate Wardens, respectively. (Defendants' undisputed facts, "DUF" 4).⁴

Two incidents at the facility in May 2008 caused PVSP officials to place the Northern Hispanic, Southern Hispanic, Mexican-Nationals, and White inmate groups (the latter of which Plaintiff was a part) on a modified program. (Doc. 37-3). This restricted many of the privileges allowed to the inmates, which included denial of exercise or yard time. Id. In the first incident, on May 7, 2008, the Northern Hispanics attacked several members of a Fresno area gang identified as the Fresno Bulldogs. (Doc. 37-3 at 3, ¶13). The attack prompted PVSP officials to place the Northern Hispanic inmates on a modified program for which a Program Status Report was developed. (Doc. 37-3 at 3 ¶13). A week later, the Southern Hispanics attacked several Fresno Bulldogs. (Doc. 37-3 at 3, ¶14). The attack resulted in a riot which involved over 40 inmates. (Doc. 37-3 at 3, ¶14). The May 14, 2008 attack prompted PSVP officials to place all inmates housed in Facility B on a modified program to investigate whether other groups intended to attack the Fresno Bulldogs as well. (Doc. 37-3 at 3, ¶15). By June 16, 2008, all White, Mexican-National, and Fresno Bulldog inmates (including Plaintiff) returned to their normal program. (Doc. 37-3 at 3, ¶15).

Plaintiff continued to receive his normal programming, including yard time, until August 2, 2008. (Doc. 37-3 at 4, ¶18). On that date, more than 150 inmates housed in the gymnasium

---
³ Defendants sent Plaintiff a Notice of Requirements for Opposing a Motion for Summary Judgment on July 11, 2012, as required by the Ninth Circuit's recent ruling in Woods v. Carey (9th Cir. July 6, 2012) 2012 WL 2626912 (Doc. 42). Defendant filed a Supplemental Opposition on August 13, 2012. (Doc. 43).
⁴ With the exception of Herrera, Defendants are collectively referred to herein as "PVSP officials."

became involved in a riot. (Doc. 37-3 at 4, ¶14). As a result, PVSP officials placed the entire facility on lockdown.[5] An early investigation of the incident led PVSP officials to believe that White and Mexican-National inmates initiated the attack on the Fresno Bulldogs and other inmates were drawn into the riot in order to defend themselves. (Doc. 37-3 at 4, ¶18).

During the investigation into the May and August 2008 attacks, PVSP officials learned that Northern Hispanic, Southern Hispanic, White, and Mexican-National inmates refused to program on the same yard as the Fresno Bulldogs. (Doc. 37-3 at 4-5, ¶¶20-21). As a result of this information and PVSP's ongoing investigation into the matters, the entirety of the White inmates and the Hispanic groups of inmates remained on a modified program until the beginning of December 2008. (Doc. 37-3 at 5, ¶¶20-21).

In mid-December, PVSP officials began efforts to determine which of the four inmates groups were willing to program with the Fresno Bulldogs. (Doc. 37-3 at 5, ¶¶22-23). On December 12, 2008, PVSP officials moved inmates from the four groups, who refused to program with the Fresno Bulldogs, into Buildings 4 and 5 on Facility B. Id. After PVSP officials completed their individual interviews with the Mexican-National inmates in January 7, 2009, inmates from that group who were willing to program with the Fresno Bulldogs were moved out of Buildings 4 and 5 and returned to their normal program. (Doc. 37-3 at 5, ¶24). From January 22, 2009 through February 21, 2009, PVSP officials interviewed White inmates to determine which inmates were willing to program with the Fresno Bulldogs. (Doc. 37-3 at 5, ¶25). PVSP officials gave some White inmates including Plaintiff, the opportunity to move to another facility at PVSP, in order to return to normal programming. (Doc. 37-3 at 5, ¶25; Doc. 37-5 at 5). Plaintiff refused. (Doc. 37-3 at 5, ¶25; Doc. 37-5 at 5).

---

[5] Defendants explain that although the term "lockdown" and "modified program" are often used interchangeably, a true "lockdown" involves the entire facility, whereas, "modified program" only affects the programming of a specific group or groups of inmates. (Doc. 37-3 at 2, ¶5). Whether the Court refers to Plaintiff's confinement time without exercise as a lockdowns or a modified programs is immaterial to the Court's ultimate decision in Plaintiff's case. The issue is whether Plaintiff was deprived of exercise for a period of time sufficient to implicate the constitutional violations he alleges. Here, the "modified program" denied exercise or recreational yard time. (Doc. 37-3 at 7, P34). Neither party disputes this.

On March 11, 2009, Plaintiff appeared before the classification committee. (Doc. 37-3 at 5, ¶26). The classification committee again offered Plaintiff the ability to move to Facility C so he could resume his normal program. (Doc. 37-3 at 5, ¶26). When Plaintiff rejected the offer, the committee recommended Plaintiff be transferred to another prison. (Doc. 37-3 at 5, ¶27). Plaintiff transferred to another prison in April 2009. (Doc. 37-3 at 5, ¶28).

## II.   SUMMARY JUDGMENT STANDARDS

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotation marks omitted). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Wool v. Tandem Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987). The party seeking summary judgment demonstrates it is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

1    If the moving party meets its initial burden, the burden then shifts to the opposing party to
2    present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e);
3    Matsuhita, 475 U.S. at 586. An opposing party "must do more than simply show that there is
4    some metaphysical doubt as to the material facts." Id. at 587. The party is required to tender
5    evidence specific facts in the form of affidavits, and/or admissible discovery material, in support
6    of its contention that a factual dispute exits. Id. at 586 n.11; Fed. R. Civ. P. 56(c). In addition, the
7    opposing party is not required to establish a material issue of fact conclusively in its favor; it is
8    sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the
9    parties' differing versions of the truth at trial." T.W. Electrical Serv., Inc. v. Pacific Elec.
10   Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an
11   essential element of the nonmoving party's case necessarily renders all other facts immaterial."
12   Celotex, 477 U.S. at 322.

13   Significantly, even if the motion is unopposed, a court cannot grant summary judgment
14   solely because no opposition has been filed. Cristobal v. Siegel, 26 F.3d 1488, 1494-95 & n.4 (9th
15   Cir. 1994). The court must apply standards consistent with Federal Rule of Civil Procedure 56 to
16   determine whether the moving party has demonstrated that there is no genuine issue of material
17   fact and judgment is appropriate as a matter of law. Henry v. Gill Indus., Inc., 983 F.2d 943, 950
18   (9th Cir. 1993). In resolving a motion for summary judgment, the Court examines the evidence
19   provided by the parties, including pleadings depositions, answer to interrogatories, and
20   admissions on file. *See* Fed. R. Civ. P. 56(c).

21   **III.    DISCUSSION**

22   Defendants assert Herrera is entitled to summary judgment because, unlike the other
23   Defendants, he did not implement a lockdown or modified program at PVSP. (Doc. 37-1 at 12).
24   With regard to the remaining Defendants, they allege they are entitled to summary judgment
25   because: 1) Plaintiff was not subjected to a lengthy or substantial denial of exercise or yard time
26   from May 2008 to August 2008; 2) they acted reasonably in implementing the modified program
27   from August 2008 to April 2009; 3) they did not discriminate against Plaintiff based on his race;
28   4) their use of racial classifications in implementing the modified programs was narrowly tailored

to serve a compelling state interest; and 5) they are entitled to qualified immunity. (Doc. 37-1).

Plaintiff disputes the reasons Defendants proffer for the modified programs and contends that such actions were solely based upon race. (Doc. 40). Additionally, Plaintiff argues that he did not individually pose a threat to prison security and therefore he should not have been subjected to the modified program. (Doc. 40).

### A. **Defendant Herrera**

In pertinent part, Section 1983 states the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983. Section 1983 requires a plaintiff to demonstrate a causal relationship between the actions of the defendants and the injury suffered. *See* Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976). The Ninth Circuit explained, "[a] person "subjects" another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Herrera declares that he was employed by the California Department of Corrections and Rehabilitation at PVSP in 2008 and 2009. (Doc. 37-4 at 1, ¶2). During that time he was the Appeals Coordinator. (Doc. 37-4 at 1, ¶2). In that capacity, Herrera screened, processed and logged all non-medical inmate grievances and administrative appeals. (Doc. 37-4 at 1, ¶2). He did not respond directly to inmate grievances; rather, he would merely forward the grievance to the proper person for a response. (Doc. 37-4 at 1, ¶3). For inmate appeals, he would complete the section regarding the appeal level and forward the document to the inmate. (Doc. 37-4 at 2, ¶4).

Herrera was aware of four appeals filed by Plaintiff regarding the modified programs/lockdowns for Facility B. (Doc. 37-4 at 2, ¶5). Herrera acknowledges signing two of

6

Plaintiff's appeals. (Doc. 37-4 at 2, ¶5). However, he explains that his signature merely indicates that the second-level response was completed. (Doc. 37-4 at 2, ¶5). He had no authority to grant the relief sought by Plaintiff nor was he involved in the daily operations of the facility. (Doc. 37-4 at 2, ¶¶5-6). Based upon the declaration of Herrera, Defendants have met their burden to show that there are no material facts to dispute that Herrera did not implement the lockdowns at issue. Additionally, Herrera has shown that he did not have the authority to grant Plaintiff the relief he requested in his appeals.

Plaintiff has not produced any evidence in his Opposition to show that, despite this evidence, Herrera was involved in some manner in implementing or maintaining the lockdown and modified programs at issue has he countered the evidence that Herrera had no authority to grant Plaintiff the relief he requested. Therefore, it is recommended that Defendant Herrera's motion for summary judgment be **GRANTED**.

### B. Cruel and Unusual Punishment – Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Prison officials therefore have a "duty to ensure that prisoners are provided with adequate shelter, food, clothing, sanitation, medical care, and personal safety." Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted). To establish a violation of this duty, a prisoner must satisfy both an objective and subjective component. *See* Wilson v. Seiter, 501 U.S. 294, 298 (1991). First, a prisoner must demonstrate an objectively serious deprivation, one that amounts to the denial of "the minimal civilized measures of life's necessities." Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). In determining whether a deprivation is sufficiently serious, a court must consider "the circumstances, nature, and duration" of the deprivation. Johnson, 217 F.3d at 731. "The more basic the particular need, the shorter the time it can be withheld." Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir. 1982).

Second, a prisoner must also demonstrate that prison officials acted with a sufficiently culpable state of mind, that of "deliberate indifference." Wilson, 501 U.S. at 303; Johnson, 217

1  F.3d at 733. A prison official is liable for denying an inmate humane conditions of confinement
2  only if "the official knows of and disregards an excessive risk to inmate health and safety; the
3  official must both be aware of facts from which the inference could be drawn that a substantial
4  risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

**1)   Loss of Exercise Time from May 14, 2008 through June 16, 2008**

Plaintiff's TAC lists June 1, 2008 as the date he first sent his grievance regarding the lockdowns at PVSP. (Doc. 20 at 3, Doc. 40 at 43). Defendants explain that the lockdown that occurred during that time began on May 14, 2008 and ended for all inmates on June 16, 2008.[6] (Doc. 37-3 at 3, ¶15; Doc. 40 at 20). Thus, assuming Plaintiff was denied exercise privileges on the first day of the modified program and the last day, he was denied yard time for 33 days.

Inmates have a constitutional right to exercise and the denial of outdoor exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. Thomas v. Ponder, 611 F.3d 1144, 1151–52 (9th Cir.2010). However, courts have held that complete denial of outdoor exercise for about a month is not unconstitutional. Hayward v. Procunier (9th Cir. 1980) 629 F.2d 599, 603 (denial of yard time for a month not unconstitutional); May v. Balwin (D. Or. 1995) 895 F.Supp. 1398, 1406 aff'd, (9th Cir. 1997) 109 F.3d 557, 565-566 (denial of yard time for 21 days not unconstitutional); Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir.1988) (denial of yard time for 28 days not unconstitutional). Furthermore, for a temporary denial of exercise to be actionable, Plaintiff must demonstrate an adverse medical impact. Lopez v. Smith, 203 F.3d 1122, 1133 n. 15 (9th Cir. 2000)

In any event, despite that the denial of exercise time for about a month is a temporary deprivation, Plaintiff provides no evidence he suffered any medical effects as a result. Given the evidence before this Court and the existing legal authority, the Court does not find Plaintiff has demonstrated the objective element as to this period of denial of yard time. As a result, it is

---

[6] Defendants argue in their points and authorities that Plaintiff received some recreational activity beginning May 20, 2008 when PVSP officials implemented the slow release of inmate to the yard. (Doc. 37-1 at 9). Shannon's declaration explains that the "slow release" included releasing eight inmates from each lockdown group. (Doc. 37-3 at 3, ¶15). However, there is no evidence of the date Plaintiff returned to normal programming or that Plaintiff was one of the eight members who began receiving yard time on May 20, 2008.

8

recommended Defendants' motion regarding Plaintiff's Eight Amendment claim for the loss of recreational activity from May 14, 2008 through June 16, 2008, be **GRANTED**.

### 2) Loss of Exercise Time from August 2, 2008 through April 2009

Plaintiff acknowledges that PVSP officials initiated the August 2008 lockdown of the entire facility to respond to the riot that occurred on August 2, 2008. (Doc. 40 at 19). He also acknowledges that the lockdown was necessary to gather information and determine how to prevent further outbreaks of violence. (Doc. 40 at 19). In his Opposition, Plaintiff does not provide any evidence to dispute Defendants' reasons for the eight-month lockdown of the Hispanic and White inmate groups; instead, he argues about the scope of the lockdown, he disputes that PVSP officials had any information that he or any of the other White inmates in the Level III yard (Facility B) intended further attacks on the Fresno Bulldogs, and argues that PVSP officials should have taken efforts, despite the lockdown, to ensure that he received exercise time. (Doc. 40 at 19-20).[7]

On the other hand, it is undisputed that on January 22, 2009, PVSP officials offered to move Plaintiff to a different facility at PVSP, to allow him to return to normal programming and Plaintiff refused. (Doc. 37-3 at 5, ¶25; Doc. 37-5 at 5). Again, on March 11, 2009, PVSP officials renewed the offer to move Plaintiff so he could resume his normal program. (Doc. 37-3 at 5, ¶26). Again, he refused. Id. Plaintiff does not justify his refusal to move in his opposition to the motion. However, in January 2009, he explained to prison officials that he refused to move because he wanted to be transferred away from PVSP. (Doc. 37-5 at 9) He reiterated his desire to transfer at his March 2009 classification review. Id. at 12.

Plaintiff fails to provide authority for the proposition that his refusal to move to a different housing unit where he would have returned to normal programming, including receiving yard time, translates into a constitutional deprivation imposed by prison officials. Likewise, he offers

---

[7] For example, Plaintiff argues, "all Defendants had to do was run a minimum yard schedule for the lockdown inmates twice a week." (Doc. 40 at 20). However, Plaintiff has no expertise in prison management and may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge. Fed.R.Evid. 701, 702. Plaintiff is limited to testifying on admissible matters to which he has personal knowledge and the competency to testify.

no argument or analysis that his refusal to move should not be part of the Court's calculus in determining whether the length of the period of denied exercise was unlawful. *See* Rodriguez v. Briley, 403 F.3d 952, 952-953 (7th Cir. 2005); Talib v. Gilley, 138 F.3d 211, 214-216 (5th Cir.1998).

On the other hand, it is undisputed that at the time Defendants made these offers, they knew Plaintiff had been deprived of outdoor exercise since August 2008. (Doc. 37-3). Plaintiff had grieved the issue and prison officials met with Plaintiff on at least two occasions to discuss it. (Doc. 37-3 at 5, ¶¶25-26.) Defendants *concede* this deprivation was an objectively serious deprivation. (Doc. 37-1 at 8-9 ("For purposes of this motion, Defendants do not dispute that the modified program from August 2008 to April 2009 that deprived LaBranch of outdoor exercise for eight months amounted to a substantial deprivation.") However, that does not end the inquiry. Hayward v. Procunier 629 F.2d 599, 603 (9th Cir. 1980) (explaining that the decision to ease restrictions after an emergency lockdown are "delicate ones, and those charged with them must be given reasonable leeway"); *see also* Ponder, 611 F.3d at 1153 (finding triable issues of fact as to whether officials acted reasonably).

Thus, the question turns on whether prison officials have met their burden of demonstrating that they did not act with deliberate indifference to Plaintiff's rights. In this regard, the Ninth Circuit has made clear that "prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost." Norwood v. Vance, 591 F.3d 1062, 1069 (9th Cir.2010) (quoting Hoptowit, 682 F.2d at 1259). Indeed, when a prison lockdown is initiated in response to a genuine emergency, prison officials may temporarily deny outdoor exercise without violating the Eighth Amendment. *See* Hayward, 629 F.2d at 603. Prison officials are to be afforded "wide-ranging deference" regarding these matters. Norwood, 591 F.3d at 1069. (*quoting* Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

Here, the evidence demonstrates that PVSP officials initiated the August 2008 lockdown in response to tension between several racial gangs/affiliated groups and the Fresno Bulldogs. On August 2, 2008, 150 inmates were involved in a riot that was later determined to have occurred because of an attack on the Fresno Bulldogs by the Mexican-National and White inmate groups.

(Doc. 37-3 at 4, ¶18). The event was preceded by the two May 2008 attacks on the Fresno Bulldogs by the Northern Hispanics and then the Southern Hispanics. (Doc. 37-3 at 3, ¶¶13-14). These attacks were consistent with the information PVSP officials learned through their earlier investigations and interviews; namely, that the Southern Hispanics had a plan to run the Fresno Bulldogs off the yard and were trying to encourage the White inmates and other Hispanic groups to do so as well. (Doc. 37-3 at 4, ¶¶16 and 20).

Defendants explain that after the August 2008 riot and the lockdown, "they continued to collect information by way of inmate interviews, cell searches, monitoring of mail and monitoring calls of non-lockdown inmates." (Doc. 37-3 at 5, emphasis added.) They do not explain why this effort was needed, what information they hoped to gain, what information was gathered, how this information confirmed the ongoing need for the lockdown or why the effort took from August 2008 through December 12, 2008. Likewise, they provide no evidence about what information was still needed before they could begin to release the inmates to normal programming. Though the Court recognizes its obligation to defer to the judgment of prison officials when conducting these investigations and when determining whether security risks remain, because Defendants have failed to present evidence that would afford the Court the ability to defer to them, the Court cannot do so.

Because of the lack of evidence, the Court must conclude that Defendants have not met their burden of demonstrating that they did not act with deliberate indifference. Nevertheless, the Court does not recommend against granting summary judgment given its analysis related to qualified immunity set forth below.

### C.   Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity standard allows for mistakes in judgment by protecting all but the plainly incompetent or those who knowingly violate the law. Hunter v.

Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589, citing Malley v. Briggs, 475 U.S. 335, 341 106 S.Ct. 1092 (1986). To determine if an official is entitled to qualified immunity the court uses a two part inquiry. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established such that a reasonable official would have known that his conduct was unlawful. Saucier, 533 U.S. at 200. The inquiry as to whether the right was clearly established is "solely a question of law for the judge." Dunn v. Castro, 2010 WL 3547637, at *2 (9th Cir. Sept.14, 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th Cir.2009)).

The situation here is similar to that in Norwood v. Vance. While housed at CSP-Sacramento, plaintiff was subjected to four separate periods of lockdown over the course of about 18 months. Norwood, 591 F.3d at 1065. Each of these events was caused by episodes of violence with prison gangs and unaffiliated inmates attacking other inmates and staff members. Id. The first event was caused by an incident in which four correctional officers were nearly killed by 11 Hispanic inmates. Id. Due to the ensuing lockdown, the plaintiff was denied exercise time for three months. Id. In the second event, a black inmate stabbed an officer. Id. As a result of this lockdown, the plaintiff was denied exercise time for about three months. Id. The third event involved an attempted murder of a correctional officer and several other attacks by gang members on other staff. Id. The plaintiff was denied exercise time for four and a half months due to the lockdown issued after the violence. Id. In the final event, gang members again tried to murder an officer. Id. The resulting lockdown denied the plaintiff exercise time for two months. Id. Thus, plaintiff was denied exercise time as a result of the lockdowns for a total of about 11.5 months of the 18 months at issue.

Three factors weighed heavily on the Norwood Court's decision to grant qualified immunity for the defendants' decision to issue the lockdowns and thereby deprive the plaintiff of outdoor exercise: 1) the fact that the qualified immunity inquiry is highly context-sensitive (i.e. whether it would be clear to a reasonable officer that denying outdoor exercise was unlawful "in the situation he confronted); 2) that prison officials must balance their duty to keep inmates safe

against their obligation to provide outdoor exercise; and 3) the fact that prison officials are entitled to great deference in balancing such obligations. Norwood, 591 F.3d at 1068, citing Farmer, 511 U.S. at 832-33; LeMaire v. Maass, 12 F.3d 1444, 1462 (9th Cir.1993).

The Court held, "prison officials have a duty to keep inmates safe, and in particular to protect them from each other. Farmer, 511 U.S. at 832-33, 114 S.Ct. 1970; LeMaire v. Maass, 12 F.3d 1444, 1462 (9th Cir.1993). Officials must balance this imperative against other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control. We've explained that 'prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials.' Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir.1982)." Norwood, 591 F.3d at 1069. The Court concluded, "Defendants here had substantial reasons for imposing the lockdowns: They were attempting to restore order during a series of brutal attacks, some lethal or nearly so. They did not place "inconsequential logistical concerns" above Norwood's need for outdoor exercise. And plaintiff offered no evidence that the lockdowns were meant to be punitive or were otherwise implemented in bad faith." Id.

Here, as in Norwood, PVSP officials faced a situation in which there was a risk of further harm to inmates and staff if the attacks continued and a risk that the affiliated Whites and Hispanic members of the inmate groups would pressure unaffiliated inmates to align with their cause. (Doc. 37-3 at 6, ¶30; *see* Norwood, 591 F.3d at 1068). Also, like Norwood, PVSP officials felt the need to take action to stop the violence between the inmate groups. (Doc. 37-3 at 6, ¶30). Three attacks involving the Hispanic and White inmate groups and the Fresno Bulldogs occurred within a four month period and each subsequent attack was more severe than the last. After learning that the August 2, 2008 attack, involving over 150 inmates, was instigated by the Whites and Mexican-Nationals, PVSP officials decided to lockdown Facility B entirely until they

could determine the extent of the conflict between the groups.[8] (Doc. 37-3 at 4-5, ¶¶20-21).

Though the right to outdoor exercise is clear and there is a clear point when maintaining a lockdown violates the Constitution, exactly where on the spectrum between "no security threat" and "riot" prison officials are obligated to lift a lockdown, is not clear. Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1070. Thus, based upon the analysis in Norwood and its similarity to Plaintiff's case, the Court finds that the right at issue here was not clearly established.

Moreover, despite that Plaintiff remained on lockdown—without any option to return to normal programming—for about four months, during the entirety of the investigation period, the Court declines to second-guess the wisdom PVSP officials in this regard. Noble, 636 F.3d at 529–31; Norwood, 591 F.3d at 1069–70. As noted above, the issues regarding how to best protect inmates from racial violence is "are delicate ones, and those charged with them must be given reasonable leeway." Hayward, 629 F.2d at 602. Defendants have demonstrated that the yard restrictions in Facility B were imposed as a result of serious instability between the specific inmate groups discuss above. Due to the ongoing threats of violence against the Fresno Bulldogs prison officials could have reasonably believed they were required to return inmates to normal programming *only after* they could be assured that the risk was fully mitigated. Indeed, the uncontroverted evidence establishes that the temporary suspension of outdoor exercise was a reasonable response to ongoing violence between the Fresno Bulldogs and the White and Hispanic groups.

Thus, the Court recommends that the Defendants' motion for summary judgment related to the Eighth Amendment claims be **GRANTED** based upon their entitlement to the protections of qualified immunity.

### D.    Equal Protection – Fourteenth Amendment

Defendants argue that the August 2008 lockdown was not discriminatory because it affected three other prison groups, not just White inmates. Defendants further assert that their

---

[8] The investigation was slow and slowed further by White and Mexican-National inmates who refused to communicate with prison staff. (Doc. 37-3 at 4, ¶20). Nevertheless, by December 12, 2008, PVSP officials were able to separate the indisputably disruptive inmates, who continued to refuse to program with the Fresno Bulldogs, into two buildings within Facility B. (Doc. 37-3 at 5, ¶22).

1  actions were narrowly tailored to secure the safety of the inmates because they separated the
2  disruptive groups, removed group leaders from the yard, and interviewed inmates to determine
3  whether they would be willing to program with the Fresno Bulldogs. (Doc. 37-1 at 11).

4  "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment
5  from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974).
6  Invidious discrimination, like racial segregation, is unconstitutional regardless of whether it
7  occurs inside or outside of prison. Johnson, 543 U.S. 499, 505. A prison classification based on
8  race is immediately suspect and is subject to the same strict scrutiny as a racial classification
9  outside prison. Id. at 508–10. The strict scrutiny analysis cannot be avoided by showing that
10 officials also locked down other groups of inmates based on race in response to a riot. Johnson,
11 543 U.S. at 506. (explaining that "racial classifications receive close scrutiny even when they
12 may be said to burden or benefit the races equally"). Therefore, it is the prison officials who must
13 demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state
14 interest. Id. at 510–11.

15 In order to prevail on summary judgment, Defendants must show that "reasonable men
16 and women could not differ regarding the necessity of a racial classification in response to prison
17 disturbances and that the challenged racial classification was the least restrictive alternative (i.e.,
18 that any race-based policies are narrowly tailored to legitimate prison goals)." Richardson v.
19 Runnels, 594 F.3d 666, 671 (9th Cir.2010) (citing Johnson, 543 U.S. at 505). Since Defendants
20 acknowledge that race was one of the factors used to identify the inmates subject to the lockdown,
21 Plaintiff need not prove discriminatory intent. (Doc. 37-3 at 6, ¶ 29); *See* Walker v. Gomez (9th
22 Cir. 2004) 370 F.3d 969, 974.

23 On the other hand, clearly, prison security is a compelling governmental interest. Johnson,
24 543 U.S. at 512. Therefore, at issue is only whether Defendants' use of race to determine which
25 inmates were subjected to the lockdown/modified program, was the least intrusive means of
26 achieving prison security.

27         **1)    Loss of Exercise Time from May 14, 2008 through June 16, 2008**

28 When the first attack (relative to Plaintiff's TAC) on the Fresno Bulldogs occurred on

May 7, 2008, PVSP officials only placed the Northern Hispanic inmates—the attackers--on lockdown. (Doc. 37-3 at 3, ¶13). It was not until the May 14, 2008 attack on the Fresno Bulldogs by the Southern Hispanic inmates, that PVSP officials placed all of Facility B on lockdown. (Doc. 37-3 at 3, ¶15). They did this to ensure the violence did not boil over to the rest of the facility while they determined whether other ethnic groups or gangs had plans to attack the Fresno Bulldogs. Id. Within a week, PVSP officials began releasing Facility B inmates to normal programming. (Doc. 37-3 at 3, ¶15.) By June 16, 2008, all inmates housed in Facility B except the Northern and Southern Hispanics—who were involved in the two attacks—were returned to normal programming. Id.

The programming changes described by Defendants for the this lockdown amply demonstrate that the race-based security measures complained of by Plaintiff were narrowly tailored and were implemented to resolve the compelling government interest of restoring prison security and discipline. *See* Johnson, 543 U.S. at 512, citing Lee v. Washington, 88 S.Ct. 994. Thus, it is recommended that Defendants' motion regarding the Equal Protection claim for the loss of recreational activity from May 14, 2008 through June 16, 2008 be **GRANTED**.

### 2)    Loss of Recreational Activity from August 2008 through April 2009

It was not until the large scale riot on August 2, 2008 that PVSP officials placed all inmates on lock down. (Doc. 37-3 at 4, ¶18). After four months of investigation, PVSP officials determined which of the individuals within the four inmate groups were unwilling to program with the Fresno Bulldogs. Between December 12, 2008 and December 15, 2008, PVSP officials moved the disruptive inmates (including those involved in the leadership of the White inmates) to Buildings 4 and 5 on Facility B[9] to allow the other inmates to return to normal program and to persuade the other White inmates to program with the Fresno Bulldogs and return to normal programs. (Doc. 37-3 at 5, ¶¶22-23).

---

[9] It is unclear whether Plaintiff was moved to Buildings 4 or 5 with these inmates or which "other inmates" returned to normal programming in December 2008. However, clearly Plaintiff continued to remain on lockdown in Facility B because some White inmates had still refused to program with the Fresno Bulldogs and PVSP officials had not yet interviewed individual inmates to see who might be willing to participate in such programming.

16

1    In January 2009, PVSP officials also started interviewing individual members of each of
2  the inmate groups on lockdown to determine if individual inmate-members were willing to
3  program with the Fresno Bulldogs. (Doc. 37-3 at 5, ¶¶24-25). On January 22, 2009, PVSP
4  officials began interviewing White inmates about their willingness to program with the Fresno
5  Bulldogs. (Doc. 37-3 at 5, ¶25). PVSP officials completed their interviews by February 21,
6  2009. (Doc. 37-3 at 5, ¶25). During the interviews, PVSP officials gave White inmates,
7  including Plaintiff, the opportunity to move to another facility. (Doc. 37-3 at 5, ¶25). Plaintiff,
8  along with some other White inmates, refused. (Doc. 37-3 at 5, ¶25).

9    Defendants explain that because the White and three Hispanic inmate groups refused to
10  program with the Fresno Bulldogs, PVSP officials decided the most prudent course of action to
11  prevent further violence on the yard, was to keep the resistant inmate groups in lockdown status.
12  (Doc. 37-3 at 6, ¶31). PVSP officials determined it was necessary to deny recreation yard to
13  those groups because allowing them to congregate in common areas provided them with "an
14  opportunity to commit assaults, relay information or threats, plan illegal activities or exchange or
15  obtain weapons or contraband." (Doc. 37-3 at 6, ¶31). Aside from these concerns, Defendants
16  explained that much of PVSP's staff resources were dedicated to the ongoing investigation into
17  the attacks; thus, it was not practical or efficient to release one group at a time to the yard.[10]

18    Although Plaintiff disputes that PVSP officials gathered information that White inmates
19  had aligned with the Southern Hispanic inmates for the purpose of "running the Fresno Bulldogs
20  off the yard" and disputes that the August 2, 2008 riot began because White and Mexican-
21  National inmates attacked Fresno Bulldogs, he fails to provide evidence to support that the
22  dispute exists. (Doc. 40 at 18-20). It is not enough for Plaintiff to believe something is true; he
23  must present evidence supporting why he believes it is true. Thus, in this regard, Plaintiff's
24  declaration lacks foundation. On the other hand, the uncontradicted evidence demonstrating that

---

[10] The Court does not find Defendants reasons to be "inconsequential logistical concerns," as in Allen, 48 F.3d at 1088; rather, Defendants set forth specific reasons for the lockdowns and the time Defendants spent to investigate the attacks and interview inmate was essential to restoring Facility B's regular programming. *See* Norwood, 591 F.3d at 1068-1069).

these groups participated in the August riot against the Fresno Bulldogs (Doc. 37-3 at 4), belies this claim

Defendants' assert that their continuing goal was to return all inmates in Facility B to normal programming.  Notably, Defendants explain that the one-on-one interviews with the individual inmates were necessary to determine which affiliated and non-affiliated inmates refused to program with the Fresno Bulldogs, before they could be released from lockdown. (Doc. 37-3 at 6, ¶30). Only in this manner could they ensure that staff and other inmates would not be at risk of further violence. Id.

Given the circumstances that gave rise to the emergency, i.e., the plan by the Southern Hispanic inmates to run the Fresno Bulldogs off the yard and the agreement by Northern Hispanic, Mexican-National, and White inmates to assist with this plan, Defendants' decision to place the Hispanic and White inmate groups on lockdown until PVSP officials could determine which of the individual inmate-members of these groups would agree to program with the Fresno Bulldogs, appears narrowly tailored to the goal of preventing further attacks by and against the Fresno Bulldogs.  (Doc. 37-3 at 3-4, ¶¶13-20). The fact that this determination was made on an inmate-by-inmate basis and that they were released to normal programming on an inmate-by-inmate basis, rather than by ethnicity, demonstrates the narrow tailoring of the officials' actions.

Plaintiff argues that PVSP officials have not shown proof of their findings.  However, Plaintiff overlooks Shannon's declaration which details why prison officials imposed the modified programs/lockdowns, the investigations undertaken and their results.   (Doc. 37-3). Because the Court finds that this evidence supports Defendant's claim that the action taken was narrowly tailored to achieve prison security and Plaintiff has not presented contradictory

evidence, the Court recommends that Defendants' motion for summary judgment on this ground be **GRANTED**.[11]

## IV. RECOMMENDATION

Based on the foregoing, the Court recommends,

1.   That Defendants' motion for summary judgment be **GRANTED.**

These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Replies to the objections shall be filed within fourteen days after service of the objections. The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 4, 2012**          **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE

---

[11] It is not clearly established that race-based lockdowns of prison facilities violate the constitution. In Walker v. Gomez (9th Cir. 2004) 370 F.3d 969, 977-78, the court determined that "it has not been clearly established that such race-based differentiation is unconstitutional in the context of a prison-wide lockdown instituted in response to gang- or race-based violence," and, therefore, found defendants were entitled to qualified immunity. Even with the strict scrutiny standard announced in Johnson, 543 U.S. at 514, the law remains unclear.  Notably, Johnson observed, "Strict scrutiny does not preclude the ability of prison officials to address the compelling interest in prison safety." Also, despite that Walker was issued in 2004, courts continue to find the fight at issue is not "clearly established." See Corona v. Harrington (E.D. Cal., Jan. 20, 2010) 2010 WL 318555 appeal dismissed, (9th Cir. 2011) 423 Fed.Appx. 695 and Williams v. Pliler (E.D. Cal., Jan. 9, 2007) 2007 WL 81914 report and recommendation adopted, (E.D. Cal., Mar. 20, 2007) 2007 WL 869022 (relying on Walker and finding that issue of race-based differentiation in the context of prison-wide lock downs instituted because of gang/race-based violence is not clearly decided).